**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOLANTA A.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 19 C 70** |
| **v.** | ) | |
| | ) | **Magistrate Judge Schenkier** |
| **ANDREW SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>[1]

Plaintiff, Jolanta A., moves for reversal and remand of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability benefits (doc. # 13: Pl.'s Mot. For Summ. J., doc. # 14: Pl.'s Mem.). The Commissioner has filed a response brief, asking this Court to affirm the Commissioner's decision (doc. # 21: Def.'s Mot. For Summ. J., doc. # 22: Def.'s Resp.). Plaintiff has filed her reply (doc. # 23: Pl.'s Reply). The matter is fully briefed. For the following reasons, we deny Ms. A.'s motion, grant the Commissioner's motion, and affirm the Commissioner's decision.

**I.**

Ms. A. applied for disability insurance benefits ("DIB") on January 22, 2015, alleging an onset date ("AOD") of February 24, 2014 (R. 22, 73-74). Ms. A.'s date last insured was June 30, 2017 (R. 22). Ms. A.'s claim and subsequent appeal for reconsideration were both denied (R. 22,

---

[1] On February 25, 2019, by consent of the parties and pursuant to 28 U.S.C § 636(c) and Local Rule 73.1, this case was assigned to this Court for all proceedings, including entry of final judgment (doc. ## 9, 10).

80, 113).[2] Shortly thereafter, Ms. A. filed a written request for a hearing in front of an Administrative Law Judge ("ALJ") (R. 22, 122-23). Ms. A. and a Vocational Expert ("VE") testified at the hearing which was held on April 5, 2017 (R. 22, 42). On November 7, 2017, the ALJ issued a decision denying Ms. A.'s claim for benefits (R. 32). The Appeals Council declined to review the ALJ's decision, making it the final word from the Commissioner (R. 1-3). *See Varga v. Colvin,* 794 F.3d 809, 813 (7th Cir. 2015); 20 C.F.R. § 404.981.

## II.

Ms. A. was born on August 22, 1963 and was 53 years old on the date of the hearing (R. 45, 73). Ms. A. claims she cannot work due to low back pain, sciatica, and disc problems in her back stemming from an accident she suffered while working as a housekeeper at a hospital on February 24, 2014 (R. 73, 231, 251, 350). Ms. A. was cleaning a patient's room when she felt a sharp pain in her lower back and almost fell over (R. 251). Ms. A. was taken by wheelchair to the emergency room where she was diagnosed with low back strain and proscribed diazepam (valium) and ibuprofen (R. 251, 352). She has since experienced severe lower back pain that radiates down her legs (R. 251). Ms. A. indicated that she has seen many doctors for her ailments, was placed on pain medication and received two epidural injections, but still experiences pain (*Id.*). After the accident, she was placed on light duty and worked part-time (four hours per day for five days per week) in the hospital's radiology department at a desk job and was on a lifting restriction of five pounds (R. 245, 251).

Ms. A. saw her primary care physician, Julita K. Sadowski, M.D., on a regular basis from February 2014 to May 2017 (R. 414-588, 595-621). On March 10, 2014, Dr. Sadowski stated Ms.

---

[2] Ms. A.'s first two appeals for reconsideration were allowed and deemed her "disabled" based on a representation that Ms. A. only spoke Polish, not English (R. 91, 101). Ms. A.'s attorney supplied evidence clarifying Ms. A.'s ability to speak English and she was then deemed "not disabled" (R. 108, 113).

A. was unable to return to work "until further notice" due to acute low back pain and sciatica (R. 479). On March 21, 2014, Dr. Sadowski extended Ms. A.'s inability to return to work but noted the low back pain was better (R. 481). On March 28, 2014 Dr. Sadowski noted a worsening of Ms. A.'s low back pain and continued the no return to work directive (R. 482). On April 11, 2014, Dr. Sadowski stated that Ms. A. could not return to work "until further notice" due to her low back pain and bulging disc (tear), and referred Ms. A. to an orthopedic specialist (R. 464).

Over the course of her treatment, Ms. A. was evaluated and treated at Illinois Bone & Joint Institute ("IBJ") by Joseph L. D'Silva, M.D. and Saint Mary and Elizabeth Medical Center for physical therapy services, both on referral from her primary care physician, Dr. Sadowski (R. 324-341, 372). On April 17, 2014, Ms. A. was evaluated by Catherine B. Bermudez, RPT (R.375). Ms. A.'s lumbar flexion and extension were both decreased by 25 percent and she could ambulate without deviation (R. 374). Her pain at the end of the physical therapy session was a two out of ten (*Id.*). The physical therapist assessed Ms. A. with impairments of impaired joint mobility, motor function, muscle performance, and range of motion associated with connective tissue dysfunction (*Id.*).

Dr. D'Silva first saw Ms. A. on April 24, 2014 (Ms. A. had undergone an evaluation but no therapy sessions yet) (R. 335). Ms. A. reported some improvement in her pain, and stated that it was no longer radiating to her toes (*Id.*). She did experience pain in her low back and proximal thighs that she rated a six out of ten and not occurring every day (*Id.*). Ms. A. reported that her pain worsened after standing and sitting for long periods of time and she takes ibuprofen as needed for pain relief (*Id.*). A review of Ms. A.'s April 9, 2014 MRI revealed a mild disk bulge at L2-L3, a small central disk protrusion at L4-L5, mild left neural foraminal stenosis at L4-L5, a small right paracentral disk protrusion at L5-S1 and mild bilateral neural foraminal stenosis, L5-S1 (R. 335,

340-41, 356-63). The April 24, 2014 x-ray showed disk narrowing at the level of L5-S1 (R. 336, 339). On examination by Dr. D'Silva, Ms. A. had no hip irritability, negative straight leg raise, and she was able to forward flex at her waist to her knees, extension twenty degrees (R. 336). Ms. A. had right paraspinal spasm, brisk and equal reflexes, neurovascularly intact distally, and five out of five strength of her lower extremity muscle groups (*Id.*). Dr. D'Silva planned for Ms. A. to continue physical therapy, to return in two weeks for a follow-up appointment, and to return to work in a sitting job (*Id.*).

On May 8, 2014, Ms. A. was seen for her lumbosacral strain from her work-related injury (R.334). She attended therapy, and reported an increased amount of pain with her sitting job (*Id.*). Ms. A. complained of pain in her low back and radiating down the right buttock to her midthigh, and she rated her pain a seven or eight out of ten (*Id.*). Ms. A. took ibuprofen for pain relief (*Id.*). Ms. A.'s examination results were unchanged from the April 24 visit, and Dr. D'Silva had her off work for two weeks (*Id.*).

On May 21, 2014, Ms. A. stated her pain would at times go from a seven to nine (R. 333). Dr. D'Silva again described her examination as "unchanged" and that Ms. A. was "grossly neurovascularly intact" (*Id.*). Dr. D'Silva recommended therapy three times a week for Ms. A., switched her medication to Ultram, and determined she could perform a sitting job four hours a day (*Id.*).

During a June 2, 2014 appointment with Dr. D'Silva, Ms. A. reported that she had increased pain while helping her husband with lawn work (R. 331). Dr. D'Silva described the pain as nonradicular in the right lateral low back region (*Id.*). He noted that Ms. A. takes an occasional Ultram and was able to return to work part-time without difficulty (*Id.*). Ms. A. could flex just short of her toes, 30 degree of extension, and perform lateral bending and rotation – all without

difficulty (*Id.*). Her straight leg raise was negative, there was no hip irritability, and the only reproduction of her right low back symptoms was with inversion and eversion of her left foot (*Id.*). Dr. D'Silva stated that Ms. A. demonstrated "evidence of symptom magnification" (*Id.*). There were no objective findings correlating with Ms. A.'s subjective complaints and Dr. D'Silva opined that Ms. A. should return to her regular job with a 20-pound restriction for one week, then 30-pound restriction the following week, and then without restrictions (R. 330-31).

Ms. A. presented to the emergency room on June 9, 2014 with back pain and explained that standing and sitting for long periods increased the pain (R. 366, 368). Ms. A. exhibited decreased range of motion in her lumbar back and was diagnosed with sciatica, right (R. 366, 369).

Three days later, in Ms. A.'s physical therapy progress/discharge summary after a treatment visit on June 12, 2014, Ms. A.'s trunk flexion and extension improved from 75 percent in April to 100 percent in May (R. 381). Ms. A. also met her goal of increasing her strength to half grade to improve the functional task of walking and sitting/standing (R. 382). She did not, however, meet her goal of overall pain reduction from a four out of ten to a two out of ten to increase her sleeping tolerance (*Id.*).

On June 18, 2014, Ms. A. reported to Dr. D'Silva that she was seen in the ER on June 9, 2014 due to her pain and was prescribed Valium and Voltaren, which she had since finished, and then had begun taking Ultram for pain relief (R. 330). Upon physical examination, Ms. A. had right paraspinal spasm, she was able to forward flex at the waist to the ankles, she was neurovascularly intact distally with 2+ pedal pulses and had no hip irritability (*Id.*). Ms. A was referred to a back specialist and she was released to return to a sitting job until seen by the back specialist (*Id.*).

On July 8 and 15, 2014, Dr. Sadowski stated that Ms. A. could not return to work "until further notice" due to acute low back pain and right sciatica (R. 486-87). Edward J. Goldberg, M.D. of Midwest Orthopedics at Rush, also examined Ms. A. and on July 23, 2014 he determined that she was able to work full time with a lifting restriction of 20 pounds maximum (R. 397). Dr. Goldberg recommended that Ms. A. have two lumbar epidural injections (R. 405). On August 8, 2014, Dr. Sadowski stated that Ms. A. may not return to work until she had an evaluation with a pain specialist (R.489).

On August 25, 2014 Matthew P. Jaycox, M.D. provided his evaluation of Ms. A. to Dr. Goldberg (R. 411-13). Ms. A.'s gait was normal; her straight leg raise test was positive on her right side but negative on her left side; her range of motion was 45 out of 90 degrees in flexion of the lumbar spine, 25 out of 35 in extension, 30 out of 30 in right side bending of lumbar spine and 25 out of 30 in left side bending (R. 413). Ms. A.'s strength was five out of five in both legs, but she had a decreased range of motion of flexion on her right hip of 90 out of 125 degrees compared to 120 out of 125 of her left hip (*Id.*). Dr. Jaycox recommended that Ms. A. continue on Tramadol and Diclofenac, schedule two to three epidural steroid injections, and return to work after those injections but maintain lighter duty for her first week back to work (*Id.*).

On November 17, 2014, Dr. Goldberg determined that Ms. A. could return to work on November 17, 2014 with restrictions and light work (R. 492). Similarly, on November 25, 2014, Dr. Sadowski stated Ms. A. could return to work on December 1, 2014 with restrictions and light work (R. 493).

On December 10, 2014, Dr. Goldberg opined that Ms. A. could work full time with a 25-pound lifting restriction (R. 398). He also provided his independent medical examination (R. 401-02). Dr. Goldberg reviewed Ms. A.'s MRI and felt she had a small central herniation that resulted

in mild stenosis L4-L5 and some right foraminal stenosis (R. 401). He also reviewed Ms. A.'s care under Dr. Jaycox who completed two lumbar epidural injections (August 27 and September 26, 2014) on Ms. A. with only mild improvement in radicular complaints (R. 401-02). On October 20, 2014, Dr. Jaycox indicated the lumbar radiculopathy was somewhat improved, he recommended Lyrica and a brace, and Ms. A. was allowed to return to work with a 10-pound lifting restriction and to start work hardening (R. 402). On November 2, 2014, Ms. A. was lifting 50 pounds and on November 9, 2014 she was lifting 25 pounds floor to waist and 14 pounds overhead (*Id.*). Upon physical examination Dr. Goldberg found Ms. A. in "mild distress," forward flexion seven degrees with pain, extension 30 degrees without pain, nontender over the lumbar spine, negative straight leg raising for radicular pain, and mild right sciatic notch tenderness on the left (*Id.*). Dr. Goldberg found no evidence of symptom magnification, recommended that Ms. A. finish her work conditioning, noted that she was not taking any medication, and determined that Ms. A. could return to work with the restriction that she lift 25 pounds only occasionally (*Id.*).

In Ms. A.'s physical therapy progress / discharge summary from her December 12, 2014 appointment, she met her goal of increasing her core strength to improve lifting and prolonged standing and walking but she did not meet the goal of reducing her pain from four to two out of ten (R. 384-85).

On January 8, 2015, Dr. Sadowski returned Ms. A. to work on January 12, 2015 (R.494); however, on January 19, 2015, she stated Ms. A. was not to return to work until further notice due to acute low back pain and right sciatica (R. 495). But, on January 26, 2015 Dr. Sadowksi returned Ms. A. back to light work on January 27, 2015, noting her back pain and sciatica were "better" (R. 499).

On January 23, 2015, Dr. Goldberg provided an addendum to his Independent Medical Examination after reviewing Ms. A.'s functional capacity evaluation dated December 19, 2014 (R. 399). Dr. Goldberg opined that Ms. A. could not return to her original work position but that she could lift 27 pounds occasional floor to waist and 23 pounds frequently, she could overhead lift 15 pounds occasionally and carry 27 pounds occasionally, and she could push and pull 35 pounds occasionally (*Id.*). Dr. Goldberg stated that Ms. A. could safely work within the capacity of these restrictions (*Id.*).

On February 23, 2015, Dr. Sadowski stated Ms. A. could return to work on March 2, 2015 (R. 501), but then on March 16, 2015, wrote that Ms. A. was not to return to work until further notice due to chronic low back pain with exacerbation (R.503). Thereafter, Dr. Sadowski returned Ms. A. to work on March 30, 2015, because her back pain was "improving" but restricted Ms. A. to working four to five hours per day of light work (R. 505). On April 30, 2015, Dr. Sadowski continued this work restriction but again noted Ms. A. was "improving" (R. 506).

In her April 12, 2015 function report, Ms. A. indicated that she lives in a house with her husband (R. 256, 263). She is unable to sit or stand for long periods of time and is unable to lift heavy objects (*Id.*). She described missing work for weeks at a time due to her pain and that she was unable to take baths but rather, could only take showers (*Id.*). Ms. A. also explained that her pain is constant, and after she works for four hours, she goes home and rests for the remainder of the day (R. 257). Ms. A. dresses slowly and her husband brushes her hair for her, cooks and does the household chores (R. 257-58). Ms. A. will do minimal grocery shopping with her husband (R. 259). During the day, Ms. A. watches television and talks on the phone a few times a week (R. 260). She is unable to go out without assistance (*Id.*). Ms. A. has difficulty lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing due to her back pain (R.

261). She can walk one block before needing to rest for 20 minutes (*Id.*). Thereafter, in August 2015, Ms. A. reported that she could not sit for two hours, her back would start to hurt and she would take pain medication (R. 285).

On May 14, 2015 Dr. Sadowski summarized Ms. A.'s diagnosis as chronic low back pain, sciatica, degenerative disc disease lumbar spine, and disc herniation at L4-L5 (R. 420). Dr. Sadowski opined that Ms. A. could stand or walk for 15 to 20 minutes, walk more than one block, change position due to pain more than once every two hours, and sit or stand for 30 minutes (R. 421). Ms. A. enjoyed "transient improvement" from the epidurals and medication treatments (R. 422).

On June 1 and 12, 2015, Dr. Sadowski determined that Ms. A. could not return to work until further notice due to her chronic low back pain with exacerbation (R. 582-83). Dr. Sadowski returned Ms. A. back to work on July 6, 2015 for light duty of four to five hours per day (R. 584). Nicholas Pinilla, M.D. completed a medical consultant's review of Ms. A.'s physical RFC assessment on September 9, 2015 (R. 589-90). Dr. Pinilla checked off that he agreed with all of the limitations, symptoms, statements and conclusion (*Id.*).

On November 1, 2016, Dr. Sadowski completed a physical RFC questionnaire about Ms. A. (R. 591-94). Dr. Sadowski has treated Ms. A. every two weeks to two months since February 24, 2014 (R. 591). She diagnosed Ms. A. (1) with chronic low back pain with exacerbation, (2) disc herniation and degenerative disc disease L5 S1, and (3) right sciatica (*Id.*). Ms. A.'s prognosis was "fair," and her symptom was described as low back pain radiating along lateral aspect of right lower extremity (*Id.*). Her pain level was mild to moderate and was exacerbated by lifting, bending, twisting, and changing position (*Id.*). Ms. A. experienced an increase of her right paralumbar muscle tone and right sciatic notch tenderness (*Id.*). The side effects Ms. A. experienced were

drowsiness, edema, and elevated blood pressure (*Id.*). Dr. Sadowski checked that Ms. A.'s pain would "constantly" interfere with the attention and concentration needed to perform simple work tasks (R. 592). Ms. A. was capable of sitting for 20 minutes at a time, standing for ten or 20 minutes at a time, and could sit or stand/walk for less than two hours in an eight-hour day (*Id.*). Finally, Dr. Sadowski checked "No" in response to a question asking whether Ms. A.'s impairments were likely to produce good days and bad days (R. 594).[3]

## III.

At the April 5, 2017 hearing before the ALJ, Ms. A. was represented by counsel and assisted by an interpreter (R. 42). At the time of the hearing, Ms. A. was 53 years old (R. 45). She attended high school in Poland and has been in the United States for 25 years (*Id.*). Ms. A lives in her home with her husband (R. 45, 47).

From 2012 to 2014, Ms. A. testified that she worked as a housekeeper in a hospital (R. 47). In 2014, Ms. A. was on light duty at the hospital where she worked part-time at the front desk doing MRI paperwork (R. 48-49). Ms. A. stopped working in January of 2016 (R. 50). She further testified that in 2014 when her back was hurting her, she took medicine, attended physical therapy and received epidural shots (R. 51). Ms. A. stated that the physical therapy hurt her more then helped her, she had two epidurals that did not help her, and she took pain pills (R. 52).

At the time of the hearing, Ms. A. testified the only treatment she was then receiving was pain medication (R. 54). On the day of the hearing, she testified that her pain level was a seven or eight out of ten (R. 54). After Ms. A. took Tramadol, her pain level went down to a six but was back up to a seven or eight during the hearing (*Id.*). Ms. A. testified that in 2014 when she was first injured, her pain was so severe that she went to the emergency room (R. 55). She has not been

---

[3] In lieu of answering many of the RFC questions, Dr. Sadowski indicated that Ms. A. underwent a work evaluation in the physical therapy department (R. 593).

to the emergency room since that time but rather sees Dr. Sadowski (R. 56), who has been her family doctor for ten years (R. 65). After examining her, Dr. Sadowski would give Ms. A. more medicine (R. 57).

Ms. A. testified that her typical day starts at 7:00 a.m., she is able to shower and make herself breakfast, she watches television (in English), and eats lunch (R. 58). She also stated that she walks around and lies down on the floor, which helps her (R. 59). Ms. A. testified that her husband does the cooking, cleaning, laundry and food shopping, although if it is "very light shopping" she can do it (*Id.*). She visits friends at their homes and on the weekends, she attends a house of worship (R. 59-60).

Ms. A. stated she can lift two to three pounds (R. 60-61). She testified she can sit for an hour, 45 minutes or ten minutes – it is different every time – then she needs to get up and walk (R. 61). Ms. A. can stand for 10, 15 or 20 minutes and she can walk the length of a block (*Id.*). She cannot climb ladders and feels pain in her lower back going up and down stairs (*Id.*) Ms. A. can stand for 20 minutes and then needs a break (R. 61-62). She lays down every day for an hour because it eases her pain (R. 62). Ms. A. testified that two to three times a week she experiences "tremendous pain" and that she experiences pain at some level everyday (R. 63-64). Ms. A. takes medicine when she feels the tremendous pain and visits her doctor (R. 64). Ms. A. stated she has difficulty bending down to put her shoes on and reaching above her head (R. 64-65). Ms. A. also testified that she has difficulty following directions in English and was able to work the desk job because her boss helped her (R. 65).

During the hearing, the VE testified that Ms. A.'s work as a hospital housekeeper was medium as defined and as performed (R. 66). Her other work as a part time office clerk at the hospital was light as defined and performed (*Id.*). The ALJ provided the VE with a number of

hypothetical limitations in order to determine Ms. A.'s capacity for employment (R. 67). The ALJ first asked whether work was available for a 53-year old person with a high school diploma who speaks and reads most English at a fourth or fifth grade level; can lift 10 to 20 pounds; can sit six hours out of an eight-hour day; cannot climb ladders, ropes, or scaffolds; can do ramps and stairs with no limitations; balance is unlimited; and posturals are occasional (*Id.*). The VE testified that such a person could do the past relevant work of the office clerk (*Id.*).

The ALJ then changed the hypothetical to a person who could lift 10 to 15 pounds; needed a sit/stand option; and could walk one block with the same postural (R. 68). The VE testified that the general office worker could still be performed (R. 69). Additionally, the VE testified that at the light level the jobs available would be a packer, a small parts assembler, and a light (exertion) inspector (*Id.*).

Finally, the ALJ provided a hypothetical where the person was limited to lifting two to four pounds (R. 69). The VE stated that that individual would be at maximum sedentary, but really less than sedentary (*Id.*).

### IV.

On November 7, 2017, the ALJ, following the five-step sequential evaluation process, determined that Ms. A. was not disabled (R. 32). At Step One, the ALJ found that Ms. A. had not engaged in substantial gainful activity ("SGA") since February 24, 2014 (R. 24). While Ms. A. did report working as an office clerk at the hospital from October 2014 through July 2015, her earnings fell below the SGA threshold (*Id.*).

At Step Two, the ALJ found that Ms. A. had the severe impairments of degenerative disc disease of the lumbar spine, with right sided sciatica and radiculopathy (R. 24). At Step Three, the ALJ determined that Ms. A.'s impairment or combination of impairments did not meet or equal

the severity of an impairment listed in 20 C.F.R. §§404.1520(d), 404.1525 and 404.1526 (R. 24-25). The ALJ reasoned that despite Ms. A.'s chronic low back pain and some disc bulging, her motor strength, sensation and reflexes generally remained intact on examination, even immediately following her work injury (R. 25).

Before continuing to Step Four, the ALJ reviewed the record and determined that Ms. A. had the RFC to perform a range of light work with the following limitations: in an eight-hour workday, Ms. A. could lift, carry, push and pull up to 20 pounds occasionally and ten pounds frequently; sit for six hours; stand and walk for six hours; occasionally stoop, kneel, crouch and crawl; and never climb ladders, ropes and scaffolds (R. 25). Additionally, Ms. A. was unrestricted in balancing, climbing ramps and stairs (*Id.*).

The ALJ acknowledged that Ms. A. attributes her back pain and limitations to a work injury that occurred on February 24, 2014 (R. 25). However, the ALJ found that although Ms. A's medically determinable impairments could reasonably be expected to cause her alleged symptoms, Ms. A.'s statements concerning the intensity, persistence and limiting effects of the symptoms are not entirely consistent with the medical evidence and other evidence in the record (R. 26).

The ALJ determined that Ms. A.'s statements about the intensity, persistence, and limiting effects of her symptoms were inconsistent with the objective record, her functional capacity evaluation and most opinion evidence (R. 26). The ALJ determined that the record disclosed Ms. A. was seen in the emergency room after sustaining a low back strain at work and was released on pain medications (*Id.*). Dr. Sadowski prescribed her Ibuprofen as needed and recommended physical therapy (*Id.*). By April 24, 2014, Ms. A. had attended an initial therapy evaluation but no therapy sessions (*Id.*). Her pain was no longer radiating to her toes, but she did have low back pain radiating to her thighs that was worse after standing or sitting for prolonged periods (*Id.*). Dr.

13

D'Silva assessed lumbosacral strain, recommended physical therapy and felt Ms. A. could do a sitting job if available (*Id.*).

The ALJ highlighted the findings of the April 2014 lumbar x-ray and MRI (R. 26). On May 6, 2014, Ms. A. reported increased pain from her sitting job but the ALJ noted that her physical examination remained unchanged (*Id.*). Dr. D'Silva had her off work for two weeks and on May 21, 2014 she remained neurovascularly intact and could return to work at her sitting job four hours per day (*Id.*).

On June 2, 2014, Ms. A. reported performing her sitting job without difficulty but described a back-pain exacerbation after helping her husband with yard work (R. 26). The ALJ reviewed her ability to extend, bend and rotate and noted that Dr. D'Silva indicated that no objective findings correlated with her subjective complaints and discerned evidence of symptom magnification (*Id.*). He returned her to her regular job with a 20-pound lifting restriction for one week that progressed to 30 pounds the following week then unrestricted thereafter (*Id.*). Two weeks later, Ms. A. reported increased pain and radicular symptoms after returning to work and was seen in the emergency room the previous week (*Id.*). Ms. A. was able to flex at the waist to the ankles and Dr. D'Silva released her to work a sitting job until she could be seen by a back specialist (R. 27).

The ALJ noted that by July 23, 2014, Ms. A. was at maximal medical improvement and had a 20-pound lifting restriction (R. 27). Ms. A.'s physical examination showed flexion at 80 degrees, with 30 degrees extension and side bending (*Id.*). Ms. A. had full motor strength, negative straight leg raise, symmetric reflexes and intact sensation (*Id.*). The ALJ noted that Ms. A. received two lumbar epidural injections on August 27 and September 26, 2014 by Dr. Jaycox (*Id.*). The ALJ reviewed Dr. Jaycox's physical examination of Ms. A. (*Id.*). The ALJ noted that by October 20, 2014, Dr. Jaycox reported minimal improvement in Ms. A.'s back pain with epidurals but her

14

radiculopathy improved (*Id.*). Dr. Jaycox recommended Lyrica and a brace, released her to return to work with a ten-pound lifting restriction and start work hardening (*Id.*).

By December 10, 2014, Ms. A. was released to work full time with a 25-pound maximum lifting restriction (R. 27). The ALJ reviewed that Dr. Goldberg noted Ms. A. appeared in mild distress and forward flexion at seven degrees produced pain but her lumbar spine was nontender and she had negative straight leg raise for radicular pain (*Id.*). Ms. A.'s reflexes and sensation were intact, but she had mild right sciatic notch tenderness (*Id.*). Dr. Goldberg found no evidence of symptom magnification, but he did not feel she needed surgery or a brace and noted she was not taking any medication and hence did not require any (*Id.*).

The ALJ reviewed Ms. A.'s December 2014 functional capacity evaluation by Dr. Goldberg which indicated Ms. A. could not return to her housekeeping job, but she did have the ability to lift 27 pounds occasionally floor to waist and 23 pounds frequently (R. 27). Ms. A. could push and pull 35 pounds occasionally, occasionally lift 15 pounds overhead, and carry 27 pounds occasionally (*Id.*). Dr. Goldberg opined Ms. A. could safely work within that capacity and noted Dr. Jaycox returned Ms. A. to work at the light physical demand level (*Id.*).

The ALJ discussed that on January 26, 2015, Ms. A. informed Dr. Sadowski that her back pain was 60 percent better with no radiation down her legs (R. 27). Ms. A.'s physical examination showed positive straight leg raise on the right at 70-80 degrees and she stated she wanted to return to "light duty" work (*Id.*). But the ALJ also recognized that by March 2015, Ms. A. reported worsening pain after four to five hours of sitting and she had missed two days of work (*Id.*). She was not in distress but held her right lower back while walking and had a limp (*Id.*). Dr. Sadowski indicated Ms. A. could return to light duty work for four to five hours per day (*Id.*). Ms. A. felt better with four hour days in April 2015 but she still experienced stiffness at the end of the shift

15

(*Id.*). Dr. Sadowski reiterated the light duty work and four to five hours per day restriction in July 2015 (*Id.*).

The ALJ noted that after July 2015, there was little mention of treatment for Ms. A.'s back pain (R. 28). In February 2016, Ms. A. saw Dr. Sadowski for other ailments, but the only mention of her back was that Ms. A. was "waiting for disability" (*Id.*). By May 2017, Ms. A. informed Dr. Sadowski that her back had been feeling better but that she exacerbated her pain by lifting something – the pain was mild to moderate (*Id.*).

The ALJ acknowledged that in the months following Ms. A.'s injury, various physicians indicated temporary restrictions but within 12 months of her AOD, Ms. A. underwent work hardening and was released to work (R. 28). Thus, the ALJ gave these interim restrictions (prior to the FCE) no weight because she reasoned that they were clearly not intended to represent Ms. A.'s ongoing functional status for 12 consecutive months or more (*Id.*).

The ALJ also gave no weight to Dr. Sadowski's "off work" notes at various times reasoning that while many were more than 12 months after Ms. A.'s initial injury, they appeared suggestive of recommended rest after exacerbations rather than an ongoing indication that Ms. A. should remain off work indefinitely (R. 28). The AJ also determined that the evidence did not support Dr. Sadowski's suggestion that Ms. A. could work no more than a four to five hour per day schedule because Ms. A.'s physical examinations were positive primarily for tenderness and she remined neurovascularly intact (*Id.*). Additionally, the ALJ referenced the treating specialists, Drs. D'Silva and Goldberg, who opined that Ms. A. should have only lifting restrictions (light work) and noted no deficits with respect to standing, walking, or performing postural movements (*Id.*).

The ALJ stated that Ms. A. received no injections after 2014 and is not a surgical candidate (R. 28). The ALJ referenced that Ms. A.'s treatment after work hardening was routine and

16

conservative in nature and was primarily managed through Dr. Sadowski with a significant gap in the records (*Id.*). The ALJ reasoned that Ms. A.'s allegations of greater limitations were not supported by the evidence and that the evidence did not substantiate a degree of impairment that could be accommodated with standard work breaks (*Id.*).

The ALJ reviewed both Dr. Sadowski's May 2015 and November 2016 assessments of Ms. A, and while acknowledging that Dr. Sadowski was Ms. A.'s treating physician, gave her opinions minimal weight because they were inconsistent with the evidence as a whole (R. 28-29). The ALJ discussed that Dr. Sadowski noted significant medication side effects but other providers suggested Ms. A. denied side effects and while Dr. Sadowski's notes mentioned sleepiness and dizziness, her examinations were usually negative for edema (in the May 2015 and November 2016 opinions, Dr. Sadowski noted Lyrica caused edema) (R. 29, 422, 59). The ALJ mentioned that Dr. Sadowski's November 2016 restrictions contradict Dr. Sadowski's own restrictions as of July 2015, which acknowledged Ms. A.'s capacity to perform light duty work for four to five hours per day (*Id.*). The ALJ found that the degree of restriction in both assessments were inconsistent with the treatment notes which were not significant for strength or sensory deficits, with the primary objective findings being tenderness and positive straight leg raise (*Id.*). The ALJ noted that the orthopedic specialists, who treated Ms. A. closer in time to the initial injury than the time of the November 2016 Sadowski report, found that Ms. A.'s straight leg raise was usually negative, and that she was neurovascularly intact (*Id.*). The ALJ also commented that as Ms. A.'s long-time treating physician, she may be motivated to help her patient (R. 29).

The ALJ noted that Dr. Sadowski acknowledged that she did not test Ms. A.'s ability to walk, and thus declined to complete the RFC concerning specific restrictions (R. 29). Instead, Dr. Sadowski wrote that "[m]y patient had work evaluation done in physical therapy department

before," suggesting to the ALJ that in specific work-related functional restrictions, Dr. Sadowski deferred to the findings in Ms. A.'s FCE (*Id.*).

Greater weight was given by the ALJ to the orthopedic specialist, Dr. Goldberg because he based his conclusions on his own examination findings and Ms. A.'s FCE results (R. 29). The ALJ found it reasonable to limit Ms. A. over a 40-hour workweek to lifting, carrying, pushing and pulling no more than 20 pounds occasionally and ten pounds frequently (R. 30). The ALJ further found that while there were no specific restrictions with respect to performing postural movements (Ms. A. demonstrated fairly good functional range of motion, with ability to flex to her ankles at 70-80 out of 90 degrees), to avoid back pain exacerbations the ALJ found Ms. A. should avoid more than occasional stooping and crouching (*Id.*).

Finally, the ALJ gave significant weight to the State Agency consulting physicians who found a capacity for light work consistent with the RFC (R. 30). The ALJ found these opinions to be consistent with the record as a whole, the FCE, work restrictions from Dr. Goldberg, and examination findings showing intact gait, motor strength, sensation and reflexes, and reasonably preserved range of motion (*Id.*).

The ALJ found at Step Four that Ms. A. was not capable of performing her past relevant work as a housekeeper in a hospital (R. 30).[4] At Step Five, the ALJ determined that considering Ms. A.'s age, education, work experience, and RFC, there were jobs that Ms. A. could perform (R. 31).[5] Thus, the ALJ determined that Ms. A. was not disabled (R. 32).

---

[4] Although Ms. A. performed light duty work at the hospital as a general office clerk after her AOD and the VE testified that an individual with the RFC described above would be able to perform this type of work, because it was not performed at the SGA level, the ALJ found it was "not vocationally relevant past work" (R. 30).

[5] The ALJ noted that Ms. A. was 52 years old and thus was closely approaching advanced age on the date last insured, had a high school education and was able to communicate in English (R. 30). While Ms. A. testified with the assistance of a Polish interpreter, the ALJ found that the evidence did not support an inability to communicate in English but rather suggested that Ms. A. was "functionally literate enough" to perform unskilled work tasks requiring no or low literacy (R. 30-31).

## V.

We review the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is a standard that "requires more than a mere scintilla of proof and instead such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walker v. Berryhill,* 900 F.3d 479, 482 (7th Cir. 2018) (internal quotation marks and citation omitted). Ms. A. makes three arguments in favor of remand: (1) the ALJ failed to properly explain how she determined that Ms. A. could occasionally stoop; (2) the ALJ failed to properly assess the opinions of Ms. A.'s treating physician; and (3) the ALJ failed to properly evaluate Ms. A.'s symptoms (Pl.'s Mem. at 7-11).

## A.

Ms. A. claims that she alleged she had difficulty stooping because several of her examinations showed limitations on her range of motion of her lower back (Pl.'s Mem. at 7). Ms. A. acknowledged that the State Agency physicians each opined that Ms. A. could stoop occasionally, meaning she could bend at the waist for up to a third of an eight-hour workday (Pl.'s Mem. at 7-8).

Ms. A. argues that the ALJ failed to explain how she concluded that Ms. A. could occasionally stoop (*Id.*). We disagree and find that the ALJ's conclusion that Ms. A. could stoop occasionally was reasonable. The ALJ built an accurate and logical bridge between the evidence and her conclusions. The ALJ assigned "greater weight" to the opinion of Dr. Goldberg, the treating orthopedic specialist, that Ms. A. could lift more than 20 pounds occasionally and ten pounds frequently (R. 29-30). The ALJ pointed out that Dr. Goldberg did not opine that Ms. A. had postural movements, limits or restrictions, and that even when reduced, Ms. A. demonstrated fairly good functional range of motion, with an ability to flex

to her ankles at about 70-80 out of 90 degrees (R. 30). But to avoid back pain exacerbations, the ALJ deemed it prudent for Ms. A. to avoid more than occasional stooping (*Id.*). Tellingly and discussed in greater detail below, Ms. A.'s own treating physician, Dr. Sadowski, did not opine on Ms. A.'s ability to stoop in the RFC, but rather left that question (and numerous others) unanswered (R. 593).

The ALJ's decision to provide for occasional stooping in the RFC was thus supported by both Dr. Goldberg's opinion that Ms. A. had no stooping limitations and the State Agency doctors that opined Ms. A. could stoop occasionally. There was no medical opinion that Ms. A. could not stoop occasionally. The ALJ did not err in including that limitation in the RFC.

Even if the ALJ errored in evaluating Ms. A.'s ability to stoop, it was harmless. The Seventh Circuit has held that a case will not be remanded to the ALJ for "further specification where we are convinced that the ALJ will reach the same result." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). Looking at the evidence in the record, we predict that the result on remand would be the same irrespective of the parties' disagreements on whether the three jobs identified by the VE require occasional stooping or not. *Id.*

## B.

"A treating physician's opinion on the nature and severity of a medical condition is entitled to controlling weight if it is well supported by medical findings and is consistent with other evidence in the record." *Gerstner v. Berryhill,* 879 F.3d 257, 261 (7th Cir. 2018); *see* 20 C.F.R. § 404.1527(c)(2); *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018).[6] When an ALJ does not give controlling weight to a treating physician's opinion, she must then evaluate the opinion by

---

[6] The treating-physician rule has been modified to eliminate the "controlling weight" instruction for claims filed after March 27, 2017, but the previous rule applies to Ms. A.'s claim which was filed prior to that date. *See Gerstner,* 879 F.3d at 261.

following the factors outlined in 20 C.F.R. §404.1527(c)(2)-(6). These factors include: length of the treatment relationship and the frequency of examination; nature and extent of the treatment relationship; supportability; consistency; specialization; and other factors. *Knapp v. Berryhill*, 741 Fed. Appx. 324, 327-28 (7th Cir. 2018); *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010). The ALJ may not disregard the opinion of a treating physician without offering "a good reason." *Walker,* 900 F.3d at 485. However, as long as the ALJ considers these factors and minimally articulates the reasons, the decision will be upheld. *Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008). Here, the ALJ adequately supported her decision to give minimal weight to Ms. A.'s treating doctor.

The ALJ sufficiently articulated her reasoning for assigning minimal weight to Dr. Sadowski's opinions. *First*, the ALJ recognized that Dr. Sadowski was Ms. A.'s treating physician but found her opinions were inconsistent with the evidence as a whole (R. 29). The ALJ cited to examples such as Dr. Sadowski's notations of significant medication side effects while other providers suggested Ms. A. denied side effects (*Id.*). The ALJ also described how Dr. Sadowski's November 2016 assessment of Ms. A. contradicted Dr. Sadowski's own restrictions as of July 2015 that Ms. A. had the capacity to perform light duty work for four to five hours per day (*Id.*). The ALJ also pointed out that the restrictions in both the May 2015 and November 2016 assessments were inconsistent with the treatment notes which were not significant for strength or sensory deficits, with the primary objective findings being tenderness and positive straight leg raise (*Id.*). And, the specialists who treated Ms. A. found the straight leg raise was usually negative and that Ms. A. was neurovascularly intact (*Id.*).

*Second*, the ALJ also reasoned that Dr. Sadowski was the primary care physician, not an orthopedic specialist (R. 29). Importantly, the ALJ also discussed Dr. Sadowski's acknowledgment

that Ms. A.'s ability to walk was not tested, and that in Dr. Sadowski's November 2016 RFC of Ms. A., she declined to opine on the specific restrictions on lifting, prolonged sitting, the need to alternate positions, and performing postural movements, but said only that "[m]y patient had work evaluation done in physical therapy department before" (*Id.*). The ALJ found that this suggested that in terms of specific work-related functional restrictions, Dr. Sadowski deferred to the findings of Ms. A.'s FCE (*Id.*). We agree and find that this omission gave the ALJ even more reason to discount Dr. Sadowski's opinion.

*Third*, we are not persuaded by Ms. A.'s criticism of the ALJ's comment that there was a possibility that Dr. Sadowski's restrictions as expressed in the November 2016 assessment might suggest a motivation to help her patient (Pl.'s Mem. at 10). The Seventh Circuit has commented that a treater's opinion may be unreliable "if the doctor is sympathetic with the patient and thus 'too quickly find[s] disability.'" *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008). Here, the ALJ was within bounds to comment on the possibility of sympathy given what she found to be the disproportionate level of restrictions Dr. Sadowski found when compared to the medical record; the inconsistency in the level of restrictions she imposed on Ms. A. (as shown by the May 2015 and November 2016 reports); and the opinions by two treating specialists and two agency consultants finding far fewer restrictions that Dr. Sadowski proposed.

Finally, we note that the ALJ's opinion makes clear that her decision to discount Dr. Sadowski's opinion was based on the contrary evidence in the record. Although Dr. Sadowski treated Ms. A. the longest, the two orthopedic specialists, Drs. D'Silva and Goldberg, also were treaters (Ms. A. does not claim otherwise), and both opined that Ms. A. could perform light duty work with lifting restrictions of 20 pounds occasionally and ten pounds frequently. Substantial evidence supported the ALJ's conclusion that these specialists' opinions were more consistent with

22

the record than was the opinion of Dr. Sadowski. We find that the ALJ sufficiently articulated her reasons for declining to give Dr. Sadowski's opinion controlling weight, and that she adequately supported her reasons for granting that opinion minimal weight.

## C.

Ms. A.'s last argument is that the ALJ failed to properly evaluate her symptoms of pain (Pl.'s Mem. at 11). The ALJ acknowledged Ms. A.'s limitations stemming from her back pain of difficulty with lifting, prolonged sitting, standing and walking (R. 25). The ALJ also discussed that Ms. A. stated she can perform some daily activities but needs to take breaks to lie down frequently, and that her husband performs most household chores, like laundry, shopping for food, cooking and cleaning (*Id.*). The ALJ determined that these statements about the intensity, persistence and limiting effects of Ms. A.'s symptoms were inconsistent with the objective record, her functional capacity evaluation, and most opinion evidence (R. 26).

The ALJ's analysis was reasonable and was not "patently wrong." *Summers v. Berryhill*, 864 F.3d 523, 528 (7th Cir. 2017) (citation omitted) (ALJ's credibility findings are given "special deference" and will only be overturned if it is "patently wrong"). The ALJ discussed in great detail why she concluded that Ms. A. was not as limited as she alleged. We discussed above the ALJ's opinion and highlighted her discussions of the medical evidence. It was not patently wrong for the ALJ to rely on the opinions of four different doctors, including Ms. A.'s two orthopedic specialists and the two State Agency reviewing doctors who reviewed the record and opined on Ms. A.'s limitations.

## <u>CONCLUSION</u>

For the foregoing reasons, plaintiff's motion for summary judgment (doc. # 14) is denied and defendant's motion for summary judgment (doc. #22) is granted. We affirm the Commissioner's decision. The case is terminated.

**ENTER:**


**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**


**DATED: April 28, 2020**